**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Kelly ROLLINS and Dan Slaughter,
Defendants–Appellants.**

**Nos. 86–2905, 87–1176.**

United States Court of Appeals,
Seventh Circuit.

Argued Oct. 30, 1987.

Decided Nov. 21, 1988.

Rehearing and Rehearing En Banc
Denied Jan. 4, 1989.

As Amended Jan. 10, 1989.

---

Mark D. DeBofsky, Chicago, Ill., for defendants-appellants.

Bobbie McGee Gregg, Asst. U.S. Atty., Anton R. Valukas, U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before FLAUM, EASTERBROOK and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Defendants–Appellants, Dan Slaughter and Kelly Rollins, were convicted of distributing cocaine in violation of 21 U.S.C. § 841(a)(1); traveling in interstate commerce with intent to distribute cocaine in violation of 18 U.S.C. § 1952(a)(3); and conspiracy to possess and distribute cocaine in violation of 21 U.S.C. § 846. Slaughter was also convicted of four additional counts of unlawfully using a communication facility to further the distribution of cocaine in violation of 21 U.S.C. § 843(b). On appeal, the defendants raise numerous alleged errors which they argue require the reversal of their convictions and sentences. While we affirm both convictions, we remand Slaughter's case for a reconsideration of his sentence.

## I.

On January 14, 1986, Robert Wright, a Special Agent for the Federal Bureau of Investigation (FBI), met with a government informant named Eddie Wells at the Cook County Jail. At that time, Wells agreed to cooperate with the FBI by attempting to arrange a drug transaction with Dan Slaughter. On January 14, Wells placed the first of a series of six telephone calls to Slaughter to try to set up the drug deal. Agent Wright monitored and taped each of these telephone conversations with Wells' consent.

During the course of these conversations, Wells arranged to buy drugs from Slaughter; Wells and Slaughter used code words to establish the substance, quantity, and price. Agent Wright testified that the final agreement that Wells and Slaughter reached was for Slaughter to sell Wells two ounces of cocaine at $1,500 per ounce. Wells also promised to repay $1,700 that his wife Sharon owed to Slaughter. Slaughter agreed to deliver the cocaine on January 28, 1986, at 4:30 p.m. at the White Castle Restaurant on the corner of North and Central Avenues in Chicago.

On January 28, 1986, several FBI agents staked out Slaughter's and Rollins' residence in Racine, Wisconsin. At 1:23 p.m. Slaughter and a white female left Slaughter's and Rollins' house in a black Chevrolet truck and drove to a warehouse. The FBI agents identified Slaughter as the driver of the truck, but they could not identify his female passenger. At the warehouse, Slaughter went into a storage area, and remained inside for about thirty-five minutes. Slaughter and his passenger then returned to Rollins' and Slaughter's house.

At 2:45 p.m. Slaughter and the same passenger again left the house in a black Chevrolet truck. The agents followed the truck from Wisconsin to Illinois on Interstate 94. The agents dropped their surveillance once the truck reached Gurnee, Illinois. Slaughter and his passenger were later observed by a second group of FBI agents when they reached the White Castle Restaurant on the corner of North and Central Avenues in Chicago. At the restaurant, undercover FBI Agent Terri Beck was able to identify Slaughter's female passenger as Kelly Rollins.

Wells arrived at the White Castle Restaurant with Agent Beck at approximately 4:40 p.m. When Wells and Agent Beck arrived, Slaughter was inside the restaurant and Rollins was seated on the passenger side of the black Chevrolet truck. Agent Beck went inside and told Slaughter that Wells wanted to speak with him in the parking lot. When Slaughter and Agent Beck returned to the parking lot, Wells talked to Slaughter for a few moments; eventually, Slaughter asked Wells if he had the money with him. At that point, Agent Beck indicated that she was carrying the money and opened her purse to show it to Slaughter. Slaughter told her to put the money away and to go to the black truck and talk to "K.R."

Agent Beck walked over to the truck, got inside and had a brief conversation with Rollins; however, no drug sale took place. After a few moments had passed, Wells and Slaughter motioned to Agent Beck to return to the car, and she did so. A few minutes later Beck returned to the truck and this time she opened her purse to show Rollins the money. Agent Beck counted out $1,700 which Rollins confirmed was in payment of Sharon Wells' debt to Slaughter. Agent Beck counted out an additional $3,000 and asked Rollins whether the price for the cocaine was still $1,500 per ounce. Rollins confirmed that the correct price was $1,500 per ounce, took the money, and then placed two plastic bags on the front seat of the truck for Agent Beck to take.

Each bag was later found to contain one ounce of cocaine.

Wells and Slaughter had several more telephone conversations after the White Castle meeting. During these conversations, which Agent Wright also monitored and taped with Wells' consent, Slaughter asked Wells whether the cocaine had been acceptable and they made arrangements for a second cocaine sale. Once again, Slaughter and Wells used code words to establish the substance, quantity, and price. Agent Wright testified that Slaughter agreed to sell Wells half a kilogram of cocaine for $22,000; Slaughter was to deliver the cocaine at 2:30 p.m. on January 29, 1986, at a gas station on Dempster Avenue in Skokie, Illinois. On January 29, before the second transaction took place, Rollins and Slaughter were arrested by FBI agents near Zion, Illinois. At the time of their arrest, Rollins and Slaughter were in a black Chevrolet truck. The arresting FBI agents seized two telephone beepers from the truck which were admitted into evidence at trial over the defendants' objection.[1]

On February 28, 1986, a grand jury returned a seven count indictment against Rollins and Slaughter. On August 13, 1986, a jury convicted Rollins on all three counts of the indictment with which she was charged, and convicted Slaughter on all seven counts of the indictment. On November 7, 1986, Judge Holderman sentenced Rollins to six months' imprisonment, a special parole term of five years, and five years' probation. The special parole term and probation run concurrently with one another, but consecutive to the six months' imprisonment. On January 16, 1987, Judge Holderman sentenced Slaughter to several separate, but concurrent terms of incarceration, the longest of which was ten years; ordered him to pay a $125,000 fine; and sentenced him to five years' probation consecutive to his jail terms.

---

1. Although not important to this appeal, it has generally been found that drug traffickers tend to use telephone beepers as an effective means of communicating with buyers and sellers of drugs.

Judge Holderman also imposed a special parole term for life on Slaughter. One condition of Slaughter's special life parole prohibits him from associating with any person known to possess firearms or narcotics or known to be a convicted felon. As a result, Slaughter is forbidden to see or marry Rollins, to whom he was engaged at the time of trial, because she is known to be a convicted felon.

Rollins challenges her conviction on three grounds. She contends that: (1) the district court erred in denying her motion to sever her trial from Slaughter's trial; (2) the court erred when it allowed Special Agent Wright to testify as an expert witness; and (3) there was insufficient evidence to establish her guilt beyond a reasonable doubt. We affirm.

Slaughter challenges his conviction on the grounds that the district court erred when it: (1) permitted the introduction into evidence of tape recorded conversations that Slaughter had with Wells, an available out-of-court declarant, in violation of Slaughter's sixth amendment right to confront the witnesses against him, and in violation of the rule against hearsay; (2) allowed Special Agent Wright to testify as an expert witness; (3) admitted into evidence proof of other crimes, wrongs, or acts in violation of Federal Rule of Evidence 404(b); (4) denied Slaughter's request for a missing witness instruction; (5) failed to hold an evidentiary hearing on Slaughter's motion to suppress certain evidence; and (6) sentenced him to a special parole term for life that effectively prohibits him from marrying Rollins. We affirm Slaughter's conviction, but remand his case to the district court for a reconsideration of his sentence.

## II.

Rollins' first argument on appeal is that the evidence presented against her at trial was insufficient to establish her guilt beyond a reasonable doubt. She contends that the evidence was insufficient on the cocaine distribution counts because Agent Beck's in-court identification of Rollins was not definite. Rollins claims that the evi-

dence was insufficient on the charge that she traveled in interstate commerce with intent to distribute cocaine because the government failed to introduce any evidence to establish that she actually traveled from Wisconsin to Illinois. We disagree with both contentions.

When reviewing a claim that the evidence at trial was insufficient to establish guilt beyond a reasonable doubt, we must determine whether, "viewing the evidence and all reasonable inferences in the light most favorable to the government, '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Goudy*, 792 F.2d 664, 674 (7th Cir.1986) (quoting *United States v. Herrera*, 757 F.2d 144, 149 (7th Cir.1985)). "It is not for us to weigh the evidence or to determine the credibility of witnesses. The verdict of a jury must be sustained if there was substantial evidence, taking the view most favorable to the Government, to support it." *Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *see also Burks v. United States*, 437 U.S. 1, 17, 98 S.Ct. 2141, 2150, 57 L.Ed.2d 1 (1978); *United States v. Brack*, 747 F.2d 1142, 1148 (7th Cir.1984), *cert. denied*, 469 U.S. 1216, 105 S.Ct. 1193, 84 L.Ed.2d 339 (1985). An appellate court can reverse a jury's verdict of conviction only if the defendant can establish that "the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt." *Goudy*, 792 F.2d at 474. Applying this standard, we conclude that there was sufficient evidence to support the jury's verdict of conviction on all three counts of the indictment with which Rollins was charged.

Rollins argues that there was insufficient evidence to support her conviction of distributing cocaine because Agent Beck could not positively identify Rollins at trial. Contrary to Rollins' assertion, however, Agent Beck did positively identify Rollins as the individual from whom she purchased two ounces of cocaine on January 28, 1986. Although Agent Beck qualified her identification with the observation that Rollins'

hair looked a little different than it had on January 28, that qualification does not undermine the validity of Agent Beck's positive identification of Rollins. Agent Beck specifically testified that Rollins was the same person that she spoke with in the truck at the White Castle Restaurant, and the same person from whom she purchased cocaine. The jury was entitled to believe Agent Beck's testimony on this question. We therefore find that the evidence was sufficient to support the jury's verdict that Rollins was guilty of distributing cocaine.

■ Rollins also contends that the evidence was insufficient to prove that she traveled in interstate commerce with intent to distribute cocaine in violation of 18 U.S.C. § 1952(a)(3). To prove this offense, the government had to demonstrate beyond a reasonable doubt that Rollins traveled in interstate commerce with intent to promote, manage, establish, or carry on an unlawful activity. Proof of this offense requires the government to demonstrate actual interstate travel. *See United States v. Tavelman*, 650 F.2d 1133 (9th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982). Rollins argues that the evidence was insufficient on the interstate travel element because no one was able to identify her as the female passenger who was observed in the truck with Slaughter when he drove from Wisconsin to Illinois on January 28, 1986.[2] Moreover, Rollins points out that the Wisconsin surveillance team stopped their surveillance once Slaughter and his passenger crossed the Illinois border. The Chicago surveillance unit did not pick up the truck again until Slaughter and his passenger arrived at the White Castle Restaurant at 4:30 p.m. Although the record is unclear as to exactly how much time passed during the lapse in surveillance, it appears to have been at least forty-five minutes.

Special Agent Dean of the FBI testified that he was part of the surveillance team that followed Slaughter from Wisconsin to Illinois on January 28, 1986. Although Agent Dean observed a white female passenger accompanying Slaughter on that day, he could not identify the passenger. Thus, Agent Dean's testimony was that he saw Slaughter and an unidentified female passenger leave Slaughter and Rollins' home, drive to a warehouse, return to the home, and then drive across the border into Illinois where the cocaine transaction occurred. He also testified that in each instance the passenger was the same unidentified white female. Once Slaughter and his passenger reached the White Castle Restaurant, however, Agent Beck was able to identify Rollins as the passenger. Rollins was also the person from whom Agent Beck actually purchased the cocaine on January 28. Finally, Agent Beck testified that Rollins clearly knew the terms of the drug deal that Wells and Slaughter had reached.

The government argues that the jury could have inferred from this evidence that Rollins was in fact the white female passenger who was seen driving with Slaughter in his black Chevrolet truck on January 28, 1986. Taking the view of the evidence most favorable to the government, we conclude that a reasonable jury could properly accept that inference. We therefore hold that the evidence was sufficient to support the jury's verdict of conviction against Rollins on all counts of the indictment with which she was charged.

### III.

Rollins and Slaughter each raise an argument on appeal challenging one of the district court's pretrial rulings. The defendants do not, however, contest the same allegedly erroneous pretrial ruling. Rollins

2. In its brief, the government incorrectly asserts that Rollins herself was seen with Slaughter in Wisconsin. The government claims that "Rollins and Slaughter were observed leaving their residence" on January 28, and that "Rollins was observed in Wisconsin at 2:45 p.m. on the interstate highway driving toward Chicago." Government's brief at 9–10. In support of this contention, the government cites the trial transcript at page 486. A review of the transcript, however, reveals that while an FBI agent did identify Slaughter as the driver of the truck that was under surveillance on January 28, the agent specifically admitted that he could not identify Slaughter's passenger.

argues that the district court abused its discretion when it denied her pretrial motion to sever her trial from Slaughter's trial.[3] Slaughter contends that the district court erred when it denied his pretrial motion to suppress certain evidence without conducting an evidentiary hearing on his motion. We address each of these alleged pretrial errors in turn.

### A.

■ Rollins claims that the district court abused its discretion when it denied the motion she made pursuant to Federal Rule of Criminal Procedure 14 to sever her trial from Slaughter's trial.[4] Rule 14 provides:

> If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.

The decision to grant or deny severance under Rule 14 is discretionary. *United States v. Pacente*, 503 F.2d 543, 546 (7th Cir.) (*en banc*), *cert. denied*, 419 U.S. 1048, 95 S.Ct. 623, 42 L.Ed.2d 642 (1974). Thus, a district court's decision on a severance motion will be reversed only upon a showing of a clear abuse of discretion. *United States v. Shue*, 766 F.2d 1122, 1135 (7th Cir.1985); *United States v. Moschiano*, 695 F.2d 236, 245 (7th Cir.1982), *cert. denied*, 464 U.S. 831, 104 S.Ct. 110, 78 L.Ed.2d 111 (1983). Moreover, an appellate court must review the district court's exercise of discretion based upon the state of the record at the time the motion was made. *Pacente*, 503 F.2d at 546.[5]

Generally, where co-defendants assert mutually antagonistic defenses, severance must be granted. *See, e.g., United States v. Goudy*, 792 F.2d 664, 673 (7th Cir.1986); *see also United States v. Shively*, 715 F.2d 260, 268 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984) (citing *United States v. Crawford*, 581 F.2d 489, 491 (5th Cir.1978)) ("if codefendants have inconsistent defenses severance must be granted if—but only if—the defenses 'conflict to the point of being irreconcilable and mutually exclusive.' "). Severance is required where two or more defendants present mutually antagonistic defenses because of the danger that the jury may convict one of the defendants without fully considering the evidence of his or her guilt. *Shively*, 715 F.2d at 268. Defenses are mutually antagonistic only where acceptance of one defendant's defense precludes the acquittal of the other defendant. *Moschiano*, 695 F.2d at 246; *see also United States v. Banks*, 687 F.2d 967, 973 (7th Cir.1982), *cert. denied*, 459 U.S. 1212, 103 S.Ct. 1208, 75 L.Ed.2d 448 (1983); *United States v. Ziperstein*, 601 F.2d 281, 285 (7th Cir.1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980).

One of Slaughter's asserted defenses at trial was that although Rollins clearly sold cocaine to Agent Beck, he was an innocent bystander who knew nothing about this illegal activity. Slaughter also argued that the government failed to prove his guilt beyond a reasonable doubt. Rollins contends that her plan to assert an entrapment defense at trial was precluded by Slaughter's antagonistic defense. She argues that their respective defenses were mutually antagonistic because acceptance of Slaughter's defense would preclude her acquittal.

---

**3.** Although Slaughter also sought severance prior to trial, on appeal he does not contend that the district court erred in denying his severance motion.

**4.** Rollins does not contend that her case was improperly joined with Slaughter's case under Federal Rule of Criminal Procedure 8.

**5.** Significant deference is accorded a district court's decision on the question of severance

because the normally underdeveloped state of the record at the time of the motion makes informed appellate review difficult. *United States v. Shively*, 715 F.2d 260, 267–68 (7th Cir. 1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1001, 79 L.Ed.2d 233 (1984). Further, the district judge is in the best position to balance the efficiency that results from a joint trial against the potential prejudice to the government or defendants. *Id.* at 267.

We conclude that Rollins' proposed entrapment defense, if presented, would not have been mutually antagonistic to Slaughter's defense. A reasonable jury could have concluded both that Slaughter was unaware of the illegal activity, and that Rollins only sold the cocaine to Agent Beck —as a result of government entrapment. A jury could therefore have acquitted both defendants. *See United States v. Gironda,* 758 F.2d 1201, 1220 (7th Cir.), *cert. denied,* 474 U.S. 1004, 106 S.Ct. 523, 88 L.Ed.2d 456 (1985) (defenses were not mutually exclusive even where one defendant's opening statement implied that there was a conspiracy in which his codefendants participated, but denied his own participation); *Moschiano,* 695 F.2d at 246 (asserted defenses of entrapment and withdrawal from conspiracy prior to completion were held not to be mutually antagonistic. "The jury could well have believed that Moschiano had been entrapped when he carried out the sale of heroin and yet credited Bishop's defense of withdrawal."); *United States v. Vadino,* 680 F.2d 1329, 1335 (11th Cir.1982), *cert. denied,* 460 U.S. 1082, 103 S.Ct. 1771, 76 L.Ed.2d 344 (1983) (severance not required where several defendants in joint trial raised entrapment defense, even though this defense might have bolstered the credibility of the government's witnesses). The mere fact that Slaughter attempted to shift the blame to Rollins did not create a mutual antagonism with her entrapment defense thereby mandating severance of their trials.

■ Rollins contends that even if she and Slaughter did not present mutually antagonistic defenses, the actual conduct of Slaughter's defense was so unduly prejudicial to her defense that it required severance of their trials. Severance can be granted if the actual conduct of one defendant's defense unduly prejudices his or her codefendant. *See, e.g., Goudy,* 792 F.2d at 673. "This ground[ ] for severance, however, depends on a careful evaluation of facts elicited, prejudicial tendencies, and the entire course of the trial prior to the challenged conduct." *Banks,* 687 F.2d at 973. The defendant bears the burden of demonstrating undue prejudice resulting from the joint trial. *United States v. Oglesby,* 764 F.2d 1273, 1275–76 (7th Cir. 1985). To meet this burden, Rollins must establish that the joint trial was unfair, not merely that she would have had a better chance of acquittal if she had been tried separately. *Moschiano,* 695 F.2d at 246. Finally, we cannot reverse a district court's denial of a severance motion based on a claim of undue prejudice absent an abuse of discretion. *Banks,* 687 F.2d at 973.

The only evidence of prejudice to which Rollins refers in this appeal is a single comment that Slaughter's attorney made during opening statement. Arguing that Slaughter was an innocent bystander to the drug sale, Slaughter's counsel asserted Slaughter's belief that Rollins did in fact sell cocaine to Agent Beck. Specifically, Slaughter's counsel stated that "Dan Slaughter does not dispute that Kelly Rollins distributed cocaine. There is no question but that Kelly Rollins did, indeed, distribute that cocaine." We fail to see, however, how this one statement could have unduly prejudiced Rollins' entire defense.

The district court clearly instructed the jury that the attorney's opening statements were not evidence. *Opper v. United States,* 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1984) ("Our theory of trial relies upon the ability of jurors to follow instructions."). Slaughter's attorney did not repeat this argument at any other point in the trial, nor did Slaughter present any evidence supporting his contention that Rollins sold cocaine to Agent Beck. Moreover, Rollins' proposed entrapment defense would not have required her to deny that she sold cocaine to Agent Beck. We therefore fail to see how counsel's statement could have caused Rollins undue prejudice. We hold that the district court did not abuse its discretion in denying Rollins' severance motion on either the ground of undue prejudice or antagonistic defenses.

B.

■ Slaughter argues that the district court erred when, without conducting an evidentiary hearing, it denied his pretrial

motion to suppress certain evidence. Specifically, Slaughter sought to prohibit the government from introducing into evidence the two telephone beepers that were found in his truck at the time of his arrest. In his motion to suppress, Slaughter asserted that his arrest was illegal because he was not engaged in any criminal activity at the time, the officers did not have a valid arrest warrant, and the arresting officers did not have probable cause to arrest him. As a result, Slaughter argues, the evidence discovered during a search of his truck at the time of his arrest should not have been admitted because it was the fruit of an illegal arrest. On appeal, Slaughter does not challenge the admissibility of the evidence itself; rather, he argues that the district court erred simply by refusing to conduct an evidentiary hearing before denying the motion.

A district court is not required to conduct an evidentiary hearing on every motion to suppress. Rather, the court must conduct such a hearing "only if evidence on an issue of fact is necessary to the decision of the motion." *Nechy v. United States*, 665 F.2d 775, 776 (7th Cir.1981) (citing Fed.R. Crim.P. 41(e)); *see also Goudy*, 792 F.2d at 667. Because Slaughter requested the hearing, he bore the burden of showing that there were disputed issues of material fact necessitating an evidentiary hearing. *Nechy*, 665 F.2d at 776. Furthermore, to justify a hearing, the facts presented in the motion must be "definite, specific, detailed and nonconjectural." *United States v. Hamm*, 786 F.2d 804, 807 (7th Cir.1986) (collecting cases).

Neither of Slaughter's two pretrial motions to suppress contained any statement of the facts surrounding his arrest, cited any authority supporting his fourth amendment argument, or were supported by affidavits or other evidence. As a result, the district court refused to hold an evidentiary hearing both because the factual basis of the motions was insufficient, and because the motions lacked any legal merit. On appeal, Slaughter has failed to demonstrate that his pretrial motions contained the required "definite, specific, detailed and nonconjectural" statement of facts that is a prerequisite for an evidentiary hearing. Because Slaughter has not met the burden of establishing the necessity of an evidentiary hearing, we conclude that the district court did not err when it denied Slaughter's motions to suppress without conducting an evidentiary hearing.

## IV.

Both Rollins and Slaughter raise numerous objections to the admission of various evidence and testimony at trial. The first evidentiary issue that they raise on appeal involves the district court's decision to permit FBI Special Agent Wright to testify as an expert on narcotics trafficking. Slaughter asserts that the admission of this testimony caused reversible error because Agent Wright's testimony was unnecessary to the jury's understanding of the evidence and therefore not the proper subject of expert testimony. Both defendants argue that the district court erred in permitting Agent Wright to testify as an expert because his testimony was based on inadmissible hearsay evidence. Finally, Rollins and Slaughter both assert that the admission of Agent Wright's expert testimony violated their right to confront the witnesses against them protected by the sixth amendment.

At trial, Agent Wright testified that with Wells' consent he monitored all of the telephone conversations between Wells and Slaughter, taped those conversations, and monitored the sale of cocaine which occurred at the White Castle Restaurant on January 28, 1986. He also identified both the tape recordings of the telephone conversations and the transcripts of those conversations that were prepared for the jury's assistance. Agent Wright also testified about his extensive background and training as a narcotics agent.[6]

---

**6.** On appeal, neither defendant challenges Agent Wright's qualification as an expert in the field of narcotics trafficking.

Agent Wright told the jury that, in his experience, narcotics dealers use code words to disguise the true nature of their conversations when they set up drug deals. He also testified that he thought Wells and Slaughter had used such code words in the present case. For example, rather than discuss the purchase of cocaine directly, Wells and Slaughter talked about buying "t-shirts," "stuff," and "it." According to Agent Wright, however, Wells and Slaughter were actually referring to their desire to buy and sell cocaine in specified quantities at a set price per ounce. After the jury heard each tape recorded conversation between Wells and Slaughter, Agent Wright gave his opinion as to the meaning of the code words and phrases that the jury had heard. It is this portion of Agent Wright's testimony to which the defendants objected.

A party who challenges a district court's decision to admit or exclude expert testimony bears a heavy burden on appeal. A district court's decision on the admissibility of expert testimony will not be reversed absent a clear showing that the judge abused his or her discretion. *See, e.g., United States v. Devine,* 787 F.2d 1086, 1088 (7th Cir.), *cert. denied,* 479 U.S. 848, 107 S.Ct. 170, 93 L.Ed.2d 107 (1986). "In admitting or excluding expert evidence under [Federal Rule of Evidence 702] the district court has broad discretion and should be affirmed unless the decision is manifestly erroneous." *United States v. Lundy,* 809 F.2d 392, 394 (7th Cir.1987). We do not believe that the district court abused its discretion in the present case.

### A.

Slaughter argues that the jury could understand the content of the telephone conversations without Agent Wright's testimony. He therefore contends that under Federal Rule of Evidence 702[7], this testimony was improperly admitted. Rule 702 provides that the testimony of an expert may

be admitted if the witness' specialized knowledge will assist the trier of fact to understand the evidence in the case. "Courts agree that it is improper to permit an expert to testify regarding facts that people of common understanding can easily comprehend." *Lundy,* 809 F.2d at 395 (7th Cir.1987). Slaughter therefore argues that because ordinary jurors could understand all of the language used during his telephone conversations with Wells, Agent Wright should not have been permitted to give expert testimony on that subject.

■ In our view, the district court properly concluded that the meaning of narcotics code words and phrases is not within the common understanding of most jurors. We therefore agree with a number of courts that have addressed this question, that narcotics code words and the operations of drug dealers are generally an appropriate subject for expert testimony. *See United States v. Ginsberg,* 758 F.2d 823, 830 (2d Cir.1985) ("The operations of narcotics dealers are a proper subject for expert testimony under Rule 702."); *United States v. Ramirez,* 796 F.2d 212, 216 (7th Cir.1986) (FBI agent properly qualified as an expert to testify to the meaning of code words used during drug transaction); *United States v. Martino,* 664 F.2d 860, 864 n. 3 (2d Cir.1981), *cert. denied,* 458 U.S. 1110, 102 S.Ct. 3493, 73 L.Ed.2d 1373 (1982) (admission of expert testimony regarding the meaning of certain code words used during drug transaction was appropriate). The district court did not abuse its discretion in permitting Agent Wright to give his expert opinion on the meaning of the code words that Wells and Slaughter used to set-up their drug transactions.

### B.

■ Rollins and Slaughter also contend that the district court erred when it admitted Agent Wright's expert testimony because his testimony was based on inadmissible hearsay evidence. Federal Rule of

---

**7.** Federal Rule of Evidence 702 provides:
 If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact

in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Evidence 703, however, specifically allows an expert to base his or her opinion on inadmissible evidence. Rule 703 provides:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him [or her] at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinion or inferences upon the subject, the facts or date need not be admissible in evidence.

Thus, expert testimony that is based in part on hearsay may be admissible if the evidence relied on by the expert is the type of evidence that experts in that field normally rely on when forming their opinions. *United States v. Lawson*, 653 F.2d 299, 302 (7th Cir.1981), *cert. denied*, 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982).

In the present case, Agent Wright testified that in forming his opinion regarding the meaning of certain code words that Wells and Slaughter used to set-up their cocaine sale, he relied in part on what Wells told him certain words meant. Specifically, Agent Wright testified that although he had heard many of the code words that Wells and Slaughter used in other narcotics cases that he had worked on, he had never heard the specific term "t-shirts" used as a code word before.[8] According to Agent Wright's testimony, however, the term "t-shirts" is the type of word that would normally be used by narcotics dealers to disguise the true nature of their conversations. Thus, although Agent Wright testified that Wells told him that "t-shirts" meant cocaine, he also based his opinion regarding the meaning of this term on the context of Wells' and Slaughter's conversations, and his vast prior experience with narcotics trafficking and the use of code words.

The defendants object to this testimony because, in their view, the government was simply using Agent Wright as a mouth-piece for Wells. According to the defendants, the government recognized that Wells (a convicted felon and admitted perjurer) would not be a credible witness. As a result, the defendants argue, the government avoided putting Wells on the stand by substituting a highly credible FBI Agent for Wells. Rollins and Slaughter charge that the government simply used Agent Wright to sanitize testimony that would otherwise not have been believed by the jury.

Although we agree with the defendants that it would be improper to use a government agent in such a fashion, we do not believe that this was the government's intent in the present case. The government established that information obtained from informants about the meaning of specific code words is the type of evidence that is ordinarily relied upon by experts in the narcotics field. Moreover, the government demonstrated that Agent Wright's opinion was not based solely on information obtained from Wells, but was also based on the agent's extensive training and experience in the field of narcotics trafficking. Finally, the defendants were able to extensively cross-examine Agent Wright on the basis of his opinion regarding the meaning of the term "t-shirts" and other code words, and they had an opportunity to argue to the jury that Agent Wright's opinion should be rejected because of his reliance on information he received from Wells. We therefore cannot say that the district court abused its discretion in admitting Agent Wright's expert testimony regarding the meaning of these code words.

### C.

Rollins' and Slaughter's final argument on the issue of Agent Wright's expert testimony is that even if it was properly admitted under the Federal Rules of Evidence, his testimony violated their sixth

---

**8.** Agent Wright testified that during his nine years of experience as an FBI Special Agent he had been involved in over one hundred other narcotics cases, and had attended two short-term courses at the Drug Enforcement Administration school on narcotics trafficking and drug code words. Agent Wright relied on this experience in forming his opinion on the meaning of the code words Slaughter and Wells used to determine the substance, quantity, and price of the drugs involved in their transactions.

amendment right to confront the witnesses against them.[9] The confrontation clause guarantees a criminal defendant the right to cross-examine the witnesses against him or her. *Ohio v. Roberts*, 448 U.S. 56, 62, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980); *United States v. Lawson*, 653 F.2d 299, 302 (7th Cir.1981), *cert. denied*, 454 U.S. 1150, 102 S.Ct. 1017, 71 L.Ed.2d 305 (1982). Thus, to satisfy the confrontation clause, the defendant must have access to the hearsay evidence that the expert relied upon in forming his or her opinion. *Lawson*, 653 F.2d at 302; *see also United States v. Affleck*, 776 F.2d 1451, 1458 (10th Cir.1985) (where defendant had access to hearsay evidence that expert relied upon and was given an adequate opportunity to cross-examine the expert, confrontation clause was not violated). This requirement ensures the defendant's ability to effectively cross-examine the expert witness. *Lawson*, 653 F.2d at 302.

In the present case, Rollins and Slaughter had adequate access to the hearsay evidence on which Agent Wright relied in forming his opinion on the meaning of the code words Wells and Slaughter used to set-up their cocaine sales. Slaughter interviewed Wells (the hearsay source) before trial, and the government gave both defendants copies of all of the FBI reports regarding the information Wells had given to Agent Wright. At trial, both defendants were able to extensively cross-examine Agent Wright regarding the basis of his opinion. We therefore conclude that the admission of Agent Wright's testimony did not violate the defendants' sixth amendment right to confront the witnesses against them.

### V.

Slaughter's next argument on appeal is that the district court erred when it admitted tape recordings of telephone conversations that Slaughter had with Wells. These conversations were monitored by Agent Wright and taped with Wells' consent. Slaughter contends that these re-cordings contained evidence of prior bad acts, and thus, their admission violated Federal Rule of Evidence 404(b). Slaughter also asserts that these tapes were inadmissible hearsay. Finally, Slaughter argues that by admitting these tapes without requiring the government to call Eddie Wells to testify at trial, his sixth amendment right to confront the witnesses against him was violated.

### A.

In the present case, Slaughter argues that certain portions of some of the tape recorded conversations, which were admitted into evidence and played to the jury, contained references to other bad acts in violation of Federal Rule of Evidence 404(b). Rule 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he [or she] acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

In this circuit, a four-part test is used to determine the admissibility of other acts evidence under Rule 404(b). Thus, evidence of other bad acts is admissible if:

> (1) the evidence is directed toward establishing a matter in issue other than the defendant's propensity to commit the crime charged, (2) the evidence shows that the other act is similar enough and close enough in time to be relevant to the matter in issue ..., (3) the evidence is clear and convincing, and (4) the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice.

*United States v. Shackleford*, 738 F.2d 776, 779 (7th Cir.1984) (citations omitted). We note, in passing, that the Supreme Court has recently invalidated the third prong of the *Shackleford* test. *Huddleston v. United States*, — U.S. —, 108

---

**9.** "In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him [or her]." U.S. Const. amend. VI.

S.Ct. 1496, 1499, 99 L.Ed.2d 771 (1988). The Court held that only "sufficient evidence to support a finding by the jury that the defendant committed the similar act" is required in order to introduce evidence of that act. *Id.*

In this case, Slaughter argues that the tapes contained evidence of past and future drug deals (including a reference to money that Sharon Wells owed Slaughter for past drug sales); a reference to Slaughter's ability to obtain illegal weapons' silencers; and references to various acquaintances of Wells and Slaughter, who were apparently convicted criminals housed at the Metropolitan Correctional Center.

It appears from the record, however, that Slaughter failed to properly object to the admission of most of this evidence under Rule 404(b). Slaughter objected to only two of the government's ten tape recorded exhibits on Rule 404(b) grounds, and in both cases he failed to identify the portion of the tape to which he objected. "Neither a general objection to the evidence nor a specific objection on other grounds will preserve the issue for appeal." *United States v. Wynn*, 845 F.2d 1439, 1442 (7th Cir.1988). As a result, we must analyze Slaughter's Rule 404(b) claim under the plain error doctrine. A plain error is one that "results in 'an actual miscarriage of justice.'" *Id.* (quoting *United States v. Silverstein*, 732 F.2d 1338, 1349 (7th Cir.1984), *cert. denied*, 469 U.S. 1111, 105 S.Ct. 792, 83 L.Ed.2d 785 (1985)). Only if Slaughter can demonstrate that but for the erroneously admitted evidence he probably would have been acquitted, can we reverse his conviction under the plain error doctrine. *United States v. Whaley*, 830 F.2d 1469, 1476 (7th Cir.1987), *cert. denied*, — U.S. —, 108 S.Ct. 1738, 100 L.Ed.2d 202 (1988).

 As the government correctly points out, two of the allegedly improperly admitted references do not even constitute evidence of other bad acts. First, the references to the future drug transaction that Slaughter and Wells were planning were contained within Count I of Slaughter's indictment. Thus, references to this trans-

action are not other bad acts evidence, but evidence of the crime for which Slaughter was indicted. Second, references to unidentified acquaintances of Wells and Slaughter who were also housed in the Metropolitan Correctional Center are not other bad acts evidence. The government did not establish who these individuals were, nor was any evidence admitted at trial connecting these persons to any specific criminal activity.

 There are, however, two statements in the tape recorded conversations that could possibly fall within the rubric of Rule 404(b). These two references are Wells' statement that his wife Sharon owed Slaughter money for past drug sales, and the single indication that Slaughter could obtain illegal silencers for Wells. In the context of this case, however, we cannot conclude that the admission of these two references constitutes plain error.

In his opening statement to the jury, Slaughter asserted that he had no knowledge that Rollins was selling cocaine to Agent Beck at the White Castle Restaurant on January 28, 1986. As a result, Slaughter made his knowledge of the crime an issue in the case. The reference to Sharon Wells' debt to Slaughter from a prior drug deal, Agent Beck's repayment of that debt at the White Castle, and with Rollins' confirmation of this fact, tends to demonstrate Slaughter's knowledge of the illegal activity. This evidence was therefore properly admissible under Rule 404(b) to show Slaughter's knowledge of the crime charged. This evidence also meets the other prongs of the *Shackleford* test. First, the act referred to (a prior cocaine sale) was similar enough and occurred close enough in time to the charged offense to be considered relevant. Second, the prior drug sale was established by sufficient evidence—Slaughter's own admission on the tape recordings. *See United States v. Bramlet*, 820 F.2d 851, 856–57 (7th Cir.), *cert. denied*, — U.S. —, 108 S.Ct. 175, 98 L.Ed.2d 129 (1987). Finally, the probative value of this evidence was not outweighed by the possibility of unfair prejudice. We therefore conclude that the dis-

trict court did not err in admitting this evidence.

■ With regard to the isolated reference to Slaughter's ability to obtain illegal silencers, we conclude that the admission of this evidence was not a miscarriage of justice. *See United States v. Hansen,* 701 F.2d 1215, 1220 (7th Cir.1983) (quoting *United States v. Pate,* 426 F.2d 1083, 1086 (7th Cir.1970), *cert. denied,* 400 U.S. 995, 91 S.Ct. 469, 27 L.Ed.2d 445 (1971)) (court concluded that "[i]n view of the fact that the rest of the taped conversation touched upon a wide variety of details and consequences of the events at issue, it is hard to see how this single isolated comment caused a 'major prejudicial effect' outweighing only 'minor probative value.' "). We cannot conclude that had this single reference to illegal weapons been excluded, Slaughter probably would have been acquitted. Therefore, we hold that the district court's decision to admit this evidence did not create plain error.

### B.

■ Slaughter also contends that these tape recordings should not have been admitted because they violated the rule against hearsay. The Federal Rules of Evidence provide that "[h]earsay is not admissible except as provided by these rules...." Fed.R.Evid. 802. Generally, any statement that is made by an out-of-court declarant which is offered to prove the truth of the matter asserted is hearsay. Fed.R.Evid. 801(c). Admissions made by parties, however, are not hearsay. Fed.R. Evid. 801(d)(2)(A). Similarly, "a statement of which the party has manifested an adoption or belief in its truth" is not hearsay. Fed.R.Evid. 801(d)(2)(B).

In the present case, the district court concluded, and the parties do not dispute, that any statement made by Slaughter during the course of these recorded telephone conversations is a party admission and is therefore not hearsay evidence. The district court also held that Wells' side of these conversations is not hearsay because Slaughter manifested an intent to adopt Wells' statements, which were thus admissible as "adoptive admissions." On appeal, Slaughter contends that Wells' statements cannot properly be considered adoptive admissions, and thus their introduction violated the rule against hearsay.

Slaughter concedes that Wells' statements could have been admitted for the limited purpose of placing his admissions in context. As Slaughter correctly recognizes, however, such a limited admission would not permit the jury to consider these statements for the truth of the matter asserted. *See, e.g., United States v. Murray,* 618 F.2d 892, 900 (2d Cir.1980) (jury properly instructed that evidence from tape recorded conversation used to put defendant's statements in context could not be considered for the truth of the matter asserted). In the present case, Wells' statements were admitted for the truth of the matter asserted. Thus, unless Wells' side of the conversations was properly characterized as adoptive admissions, their admission would violate the rule against hearsay.

Having reviewed the transcripts of Wells' conversations with Slaughter, we conclude that the district court properly determined that Wells' statements were admissible as adoptive admissions pursuant to Federal Rule of Evidence 801(d)(2)(B). *See United States v. Kenny,* 645 F.2d 1323, 1340 (9th Cir.), *cert. denied,* 452 U.S. 920, 101 S.Ct. 3059, 69 L.Ed.2d 425 (1981) (collecting cases) (to the extent that defendant adopted informant's half of the conversation, it can be treated as a group of adoptive admissions by the defendant, admissible under Rule 801(d)(2)(B)). While Slaughter never specifically said "I adopt Wells' statements as my own," no such specific language of adoption is required by the Federal Rules of Evidence. Rather, a manifestation of a party's intent to adopt another's statements, or evidence of the party's belief in the truth of the statements, is all that is required for a finding of adoptive admission. In the present case, not only did Slaughter frequently agree with Wells and participate in the give and take of the telephone conversation, the evidence also demonstrated that Slaughter completed the drug deal that he and Wells

agreed to during those conversations.[10] We cannot say that the court erred in admitting these tape recorded conversations pursuant to Federal Rule of Evidence 801(d)(2).

### C.

Finally, Slaughter argues that the admission of these tape recordings, coupled with the government's failure to call Wells to testify, violated his sixth amendment right to confront the witnesses against him. As previously noted, the purpose of the confrontation clause is to ensure a defendant's ability to effectively cross-examine the witnesses against him. We have concluded that the district court properly admitted Wells' half of the tape recorded conversations on the ground that Slaughter manifested an intent to adopt Wells' statements. We agree with the District of Columbia Circuit that the principles of the confrontation clause should not nullify the well-established exception to the hearsay rule for adoptive admissions. *See United States v. Lemonakis,* 485 F.2d 941, 949 (D.C.Cir.1973), *cert. denied,* 415 U.S. 989, 94 S.Ct. 1586, 39 L.Ed.2d 885 (1974). Where, as here, a party manifests an intent to adopt another person's statements as his or her own, the need to cross-examine the absent informant under oath is not present and the confrontation clause is not violated. As a result, we cannot find that the admission of this evidence violated Slaughter's sixth amendment right to confront the witnesses against him.

### VI.

Slaughter's next contention on appeal is that the district court erred by refusing to give his requested missing witness instruction. Slaughter's requested instruction would have informed the jury that because the government failed to call its informant, Eddie Wells, to testify at trial, the jury could infer that his testimony would have been unfavorable to the government. According to Slaughter, the court should have given this instruction because Wells was peculiarly within the government's control, his testimony would have elucidated important issues in the case, and the government refused to call him to testify.

The rule regarding missing witness instructions is that " 'if a party has it peculiarly within his [or her] power to produce witnesses whose testimony would elucidate the transaction, the fact that he [or she] does not do it creates the presumption that the testimony, if produced, would be unfavorable.' " *United States v. Mahone,* 537 F.2d 922, 926 (7th Cir.), *cert. denied,* 429 U.S. 1025, 97 S.Ct. 646, 50 L.Ed.2d 627 (1976) (quoting *Graves v. United States,* 150 U.S. 118, 14 S.Ct. 40, 37 L.Ed. 1021 (1893)).[11] Before a party is entitled to an instruction allowing the jury to draw a possible inference that a missing witness' testimony would have been unfavorable to the opposing party, the party seeking the instruction must satisfy two criteria. First, he or she must demonstrate that the missing witness is peculiarly within the other party's power to produce. *Mahone,* 537 F.2d at 926. This criterion can be met by showing that the witness is only physically available to the other party. Alternatively, the party seeking the instruction can demonstrate that because of the witness' relationship with the opposing party, his or her testimony is, in pragmatic terms, only available to the other side. *Yumich v. Cotter,* 452 F.2d 59, 64 (7th Cir.1971), *cert. denied,* 410 U.S. 908, 93 S.Ct. 955, 35 L.Ed. 2d 269 (1973) (witness pragmatically un-

10. As is typical in these cases, both sides point to specific passages from these numerous conversations which they argue clearly show, or clearly do not show, evidence of an intent to adopt the other party's statements. It is often difficult to determine whether a party to a telephone conversation is simply acknowledging his or her presence on the line, or actually agreeing with the speaker. Those portions of a conversation that do not evidence a clear manifestation of intent to adopt, should be admitted simply to place the party's admissions in context without admitting them for the truth of the matter asserted.

11. As this court noted in *Mahone,* 537 F.2d at 926 n. 3, however, it is generally recognized that an inference of unfavorable testimony, rather than a presumption, is raised in these cases.

available to civil rights plaintiffs in excessive use of force case where missing witnesses were police officers employed by the defendant); *see also Mahone*, 537 F.2d at 926–27 (missing witness pragmatically available only to prosecution where missing witness was a state police officer who, although not technically employed by the prosecution, was closely associated with the federal government and had a strong personal interest in the success of the prosecution).

The second criterion that the moving party must fulfill is to demonstrate that the missing witness would elucidate issues in the case. *Mahone*, 537 F.2d at 927. It is impermissible to allow a jury to infer that a missing witness' testimony would have been unfavorable to the opposing party " 'where the unpresented evidence would be merely cumulative.' " *Id.* (quoting *United States v. Johnson*, 467 F.2d 804, 808 (1st Cir.1972), *cert. denied*, 410 U.S. 909, 93 S.Ct. 963, 35 L.Ed.2d 270 (1973)). A missing witness instruction is also inappropriate where the unpresented evidence would be irrelevant to the issues in the case.

In the present case, it is undisputed that Wells was physically available to both parties. At the time of Slaughter's trial, Wells was an inmate at the Metropolitan Correctional Center, just blocks away from the trial. Either party could have called him to testify. Slaughter, however, argues that in a pragmatic sense, Wells was only available to testify for the government. Slaughter contends that Wells' role as a government informant made it unrealistic to presume that Wells was equally available to testify for the defense.

Following an evidentiary hearing at which Wells testified, the district court concluded that Wells was equally available to testify for both parties at trial. Furthermore, the district judge found that if Wells had been called to testify, his testimony would have been consistent with Agent Wright's testimony and would have been favorable to the government. As a result, the court refused to give Slaughter's requested missing witness instruction.

We conclude that the district court did not err in refusing Slaughter's proposed instruction. The mere fact that Wells was a government informant does not inevitably establish that he was pragmatically available to testify only on behalf of the prosecution. *See United States v. Bramble*, 680 F.2d 590 (9th Cir.), *cert. denied*, 459 U.S. 1072, 103 S.Ct. 493, 74 L.Ed.2d 635 (1982) (missing witness instruction properly denied where defense counsel interviewed government informant and decided not to call him to testify); *United States v. Montoya*, 676 F.2d 428 (10th Cir.), *cert. denied*, 459 U.S. 856, 103 S.Ct. 124, 74 L.Ed.2d 108 (1982) (where defendant failed to make reasonable effort to contact government informant, court did not err in denying missing witness instruction); *United States v. Burgos*, 579 F.2d 747 (2d Cir.1978) (because government informant was made available to defendant for interviews before trial, missing witness instruction was properly denied). "Even where a witness entirely refuses to discuss a case with the defense, a missing witness instruction may be appropriately denied." *United States v. Keplinger*, 776 F.2d 678, 702 (7th Cir.1985), *cert. denied*, 476 U.S. 1183, 106 S.Ct. 2919, 91 L.Ed.2d 548 (1986); *see also United States v. Grizaffi*, 471 F.2d 69, 74 (7th Cir.1972), *cert. denied*, 411 U.S. 964, 93 S.Ct. 2142, 36 L.Ed.2d 684 (1973) (district court correctly refused to give missing witness instruction where unindicted co-conspirator refused to discuss the case with defense counsel, and defendant chose not to call witness because of uncertainty regarding his possible testimony).

In the present case, Slaughter's counsel interviewed Wells at the Metropolitan Correctional Center before the trial and chose not to call him to testify. Defense counsel acknowledged to the district court that he chose not to call Wells because his testimony would not have been favorable to the defense. In such a situation, the court did not err in refusing to give a missing witness instruction which might have had the effect of misleading the jury. *See Bramble*, 680 F.2d at 592 (where defense counsel indicated that she did not want the missing witness to testify because his testimony

might have hurt the defense, missing witness instruction was properly denied and would have misled the jury if given). District courts must have some latitude to determine when a missing witness instruction is appropriate. *Mahone*, 537 F.2d at 927. The district court conducted an evidentiary hearing and concluded that Wells was available to testify for either party. Under the facts of this case, we cannot say that the district court erred in refusing to give Slaughter's requested missing witness instruction.[12]

## VII.

Slaughter's final argument on appeal is that the sentence imposed on him by the district judge violates the Constitution. In addition to various terms of incarceration, the district judge sentenced Slaughter to a special parole term for life. One condition of this special parole prohibits Slaughter from having any contact or association with any person known to be a convicted felon. At the time of their trial, Slaughter and Rollins were engaged to be married. Thus, Slaughter's special parole condition has the effect of prohibiting him from ever associating with or marrying his fiancee because she is a known convicted felon. As a result, Slaughter contends, his sentence violates his fundamental right to marry, protected by the fifth and fourteenth amendments to the Constitution.

The district court originally imposed a similar special parole condition on Kelly Rollins. Upon further consideration, however, the district judge specifically exempted Dan Slaughter from the restrictions of Rollins' parole. Thus, although Rollins is generally prohibited from having any contact with known convicted felons, her sentence permits her to have contact with Slaughter.

In light of the district court's modification of Rollins' sentence, we decline to address the potential constitutional issues raised by Slaughter's special life parole. Instead, we remand Slaughter's case to the district court for a reconsideration of his sentence in light of the court's prior modification of Rollins' sentence and the possible constitutional problems that are raised by Slaughter's original sentence.

## VIII.

In summary, we find that the evidence was sufficient to support the jury's verdict against Rollins, that the district court did not err in denying Rollins' motion to sever her trial from Slaughter's trial, and that the court did not err when it permitted Agent Wright to testify as an expert on narcotics trafficking and code words. We also conclude that the district court did not err in denying Slaughter's motion to suppress certain evidence without holding an evidentiary hearing, that the court did not abuse its discretion when it admitted various tape recorded conversations, and that the court did not err when it refused to give Slaughter's proposed missing witness instruction. Rollins' and Slaughter's convictions are therefore AFFIRMED. Slaughter's case, however, is REMANDED for a reconsideration of his sentence.

---

12. Because we conclude that the district court did not err in refusing to give Slaughter's proposed missing witness instruction on the ground that Wells was available to testify for either party, we need not consider whether Slaughter demonstrated that Wells' testimony would have elucidated an issue in the case.