UNITED STATES of America, Plaintiff–Appellee,

v.

Joseph MARREN and Michael Russo, Defendants–Appellants.

Nos. 88–2997, 88–3044.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 15, 1989.

Decided Nov. 22, 1989.

As Amended Nov. 29, 1989.

John J. Scully, Asst. U.S. Atty., Chicago, Ill., Mervyn Hamburg, Dept. of Justice, Crim. Div., Washington, D.C., for plaintiff-appellee.

Brian M. Collins, Magee, Collins & Lodge, Chicago, Ill., for Joseph Marren.

Jack Rimland, Stamos, Rimland, Halprin & Clark, Chicago, Ill., for Michael Russo.

Before CUDAHY, FLAUM, Circuit Judges, and GRANT, Senior District Judge.[*]

FLAUM, Circuit Judge.

Michael Russo and Joseph Marren, along with three others, were charged in a 27-count indictment filed in the United States District Court for the Northern District of Illinois with conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act (RICO) (count 1), conspiracy to commit tax evasion (count 24), use of the telephone to promote a prostitution business (counts 2–23), and filing false federal income tax returns (counts 25–27), in violation of 18 U.S.C. § 1962(d), § 371 and § 1952, and 26 U.S.C. § 7201, respectively. Marren was named only in the two conspiracy counts while Russo was named in each of the counts. Following a joint jury trial, appellants and their three co-defendants were convicted on all counts. Russo was sentenced to concurrent terms of imprisonment for eleven years on count 1 and five years on counts 2–22 and 24–27, to be followed by five years of probation on count 23. In addition, the court assessed a $100,000 fine on the tax counts. Marren was sentenced to imprisonment for five years on count 1 and five years probation on count 24. We affirm on all counts.

## I. FACTS

The convictions in this case arise from the institution and operation of a scheme which permitted customers of Michael's Magic Touch, a night club owned by Michael Russo, to pay for prostitution with credit cards. Michael's Magic Touch served alcoholic beverages and entertained its patrons with nude female dancers who, when not performing on stage, solicited the club's patrons to engage in sexual activities in rooms located above the club. Payments for such services were made to the club's waitresses who in turn handed the money over to one of the club's doormen. These payments were never placed in the lone cash register, situated at the bar. Until 1981, customers were required to pay for such services in cash.

In 1978, Thomas Gervais formed National Credit Services (NCS), a company that operated a scheme to assist merchants who otherwise could not receive authorization to accept credit cards. His company applied in the names of fictitious merchants to various banks in the Chicago area for authorization to accept credit card payments from patrons. Once the applications were approved, Gervais offered his credit card services to businesses whose illegal activities made them ineligible to accept credit cards. Businesses that accepted Gervais' services were given cards in the name of one of Gervais' fictitious merchants and used those names when accepting VISA or MasterCard charges made by customers. In return, Gervais processed the payments for his clients and received payment in the

---

[*] The Honorable Robert A. Grant, Senior District Judge of the United States District Court for the Northern District of Indiana, is sitting by designation.

amount of 15% of the cost of the credit card charges that he processed.

All merchants who acquired authorization to accept credit cards were required to obtain approval for any sizeable transaction. The procedure for obtaining approval began with a call to an assigned telephone number. The operator answering the call received the information regarding the purchaser and entered that information into a computer. The computer transferred the information over telephone lines through a national network to the participating bank that had issued the credit card; in turn, the bank acquired approval from VISA's authorization center in San Mateo, California or MasterCard's authorization center in St. Louis, Missouri. The approval (or rejection) was transmitted from those centers, ultimately to the merchant via the computer and operator. The entire process was performed in a matter of seconds.

In the fall of 1980, Gervais was pressured by rival organized crime groups to allow them to provide protection for his business in exchange for a percentage of the profits. Gervais decided to seek protection, not from one of the organized crime factions, but from the FBI. He revealed his illegal activities to agent Larry Damron, who subsequently received official approval to work for NCS in an undercover capacity. Gervais remained with NCS for about six months for the purpose of acquainting Damron and two other agents with his operation. Then Gervais was phased out. In the interim period, Damron, using the name Larry Wright, was introduced to Gervais' customers as a partner in the business. Damron resolved the protection issue in favor of Victor Spilotro's organization. Spilotro, unaware of the government's newly acquired role in NCS, was to receive one-third of the profits for his role in ensuring the safety and continuity of the NCS operation. In March 1981, Gervais telephoned Michael's Magic Touch and spoke with August Russo, Michael Russo's brother, about using credit cards at that business. August Russo rejected the idea.

Between March and October 1981, NCS operated its credit card program at a number of taverns and night clubs, including some that offered prostitution services. Michael's Magic Touch was not a client, however, and no effort was made to recruit that business during that period of time. Once immersed in the business of operating NCS, Damron became acquainted with appellant Joseph Marren, who at the time was employed at one of the clubs that was an NCS client for credit cards. In mid-1981, Marren left that employment and came to work for Michael Russo as a doorman at Michael's Magic Touch. On August 14, 1981, Marren revealed to Damron that he had been hired by Michael's Magic Touch and that although the club did not allow credit cards, Marren had been trying to persuade his supervisors to begin accepting them.

On October 7, 1981, Marren spoke with Damron on the telephone. Marren told Damron to meet with him that night at Michael's Magic Touch because he had finally convinced the management to accept credit cards. Marren advised Damron that the club was interested in VISA and MasterCard but not American Express. That evening Damron met with Marren, Michael Russo and August Russo in Michael Russo's office at Michael's Magic Touch. Michael Russo asked Damron to explain how the credit card reimbursement program operated. As Damron gave his explanation, Michael Russo appeared to have a previous familiarity with the procedures. Damron provided the Russos with an imprinter and credit card slips in the name of W.G. Enterprises. Damron explained that the company was a "front account," and that if the amount of the charge exceeded $50, a telephone call would have to be made to obtain an authorization number so that payment could be guaranteed. Michael Russo indicated to Damron that he understood. Marren remarked that he also understood Damron's explanation, that he had handled credit card charges before, and that he wanted to be certain that Damron was following the same procedure as in the past. Damron fully explained the procedures. A representative of NCS would come to the club

each week to collect the completed credit card slips and would pay 85% of the amount charged on the slips. Payment would be made by check. Michael Russo told Damron to make the checks payable to cash.

The credit card system was an instant success at Michael's Magic Touch. For the remainder of 1981 Damron made weekly collections and wrote checks payable to cash that totalled more than $28,000. These checks were cashed at a nearby bank and bore the endorsement of August Russo.

On December 15, 1981, Damron and Gervais met with Marren who complained to them that for the past five weeks Michael Russo had refused to allow him to share in the credit card income. Marren remarked that he had a knack for making money for others and not profiting personally. Marren agreed with Gervais' comment that the Russos would not have as much income if they did not accept credit cards. In future meetings between these parties, Marren often complained to Damron about this predicament.

On April 27, 1982, Damron made his weekly trip to Michael's Magic Touch. He gave the club a check written on the fictitious merchant's account for $5,009.05. He also gave Marren $285 in cash, for credit card charges that Marren had concealed from Michael's Magic Touch. Between April and July, Marren received separate payments from Damron almost weekly; the amounts totalled $2,779.90.

During one of his weekly visits to Michael's Magic Touch in the summer of 1982, Marren asked Damron to explain to Michael Russo a money laundering scheme that would replace the weekly checks paid for credit card charges. Damron explained the laundering scheme and Michael Russo remarked that the advantage of the plan Damron had recommended was that there were no checks to sign. Russo asked whether any other clubs were considering the laundering scheme. Damron stated that others were involved but that he wanted to help Michael's Magic Touch because of past loyalties and financial success.

Russo replied, "We're loyal because Joe [Marren] brought you in."

The credit card operations continued without incident until August of 1984. Damron, sometimes accompanied by fellow Agent George Transeth, visited Michael's Magic Touch weekly, met with a member of the Russo family and made their collections. The checks left behind were in amounts ranging from $525 to $6,486.

On August 10, 1984, agents representing the FBI and the Internal Revenue Service entered the premises of Michael's Magic Touch and conducted a search, supported by a valid warrant. Michael Russo was present at the time of the search. One agent went to the landing area and found a man and woman engaged in sexual activity in one of the rooms. Among the items seized were financial records, the merchants' copies of credit card transaction slips, three packets, each containing $5,000 in cash, another $8,543 found in a jacket hanging in the office, and records showing the work schedules of the various dancers and the amounts of cash paid to the dancers each evening. In addition, the agents discovered a schedule of credit card charges. The schedule contained seven columns, showing (1) the name of the patron, (2) the card number, (3) the date of the transaction, (4) the amount assessed as a service charge, (5) the amount retained by the "house," (6) the amount due to the prostitute and her name, and (7) the total amount of the transaction (adding together columns 4, 5 and 6).

Michael's Magic Touch resumed credit card transactions within days after the search and seizure. On August 21, Damron and Transeth made what was to be their final visit to Michael's Magic Touch as undercover officers. The conversation with Michael Russo centered around the undeclared income from the credit card transactions. Michael Russo asked for and received a detailed explanation of Damron's collection and payment procedure. Transeth suggested that in the future the income derived from the NCS checks should be recorded and used to pay legitimate club expenses. Michael Russo reject-

ed that idea. Transeth asked, Are you gonna still keep doing what you were doing?" Michael Russo replied, "Yeah."

Shortly thereafter the undercover operation came to an end. Marren and Russo, along with three co-defendants, were indicted by the 1986 Grand Jury. The 27–count indictment charged the five defendants with conspiracy to violate RICO (count 1), conspiracy to commit tax evasion (count 24), use of the telephone to promote a prostitution business (counts 2–23), and filing false federal income tax returns (counts 25–27), in violation of 18 U.S.C. § 1962(d), § 371 and § 1952, and 26 U.S.C. § 7201, respectively. Marren was named only in the two conspiracy counts while Russo was named in each of the counts. Following a joint jury trial, the five defendants were convicted on all counts. Russo was sentenced to concurrent terms of imprisonment for eleven years on count 1 and five years on counts 2–22 and 24–27, to be followed by five years of probation on count 23. In addition, the court assessed a $100,000 fine on the tax counts. Marren was sentenced to imprisonment for five years on count 1 and five years of probation on count 24.

## II. RUSSO'S ENTRAPMENT CLAIM

■ Michael Russo's sole claim on appeal is that the trial court erred in refusing to instruct the jury on entrapment.[1] At trial, Russo's sole theory of defense was that he was entrapped by the government into violating federal laws. In his view, the credit card scheme, which required the use of interstate phone facilities, expanded his admittedly criminal conduct from purely local violations to federal offenses. He argued that but for the government's conduct (through its involvement in NCS) in allegedly inducing him to begin accepting credit cards, he would not have agreed to engage in the conduct that made him subject to federal prosecution.

In examining Russo's argument, we note that this Court has adopted a four-part test for determining when a defendant is entitled to a particular theory of defense instruction. In *United States v. Douglas*, 818 F.2d 1317 (7th Cir.1987), we held that a defendant is entitled to an instruction on his or her theory of defense if: (1) the defendant proposes a correct statement of the law; (2) the defendant's theory is supported by the evidence; (3) the defendant's theory of defense is not part of the charge; and (4) the failure to include an instruction on the defendant's theory of defense in the jury charge would deny the defendant a fair trial. *Id.* at 1320–21. Applying this test to the case at bar, we find that for the reasons stated below, the trial court properly refused to instruct the jury on entrapment because the defendant failed to satisfy the second prong of *Douglas:* his requested instruction was not supported by the evidence.

■ A valid entrapment defense has two related elements: government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct. *Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Mathews v. United States*, 485 U.S. 58, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988); *United States v. Hawkins*, 823 F.2d 1020 (7th Cir.1987). A defendant is entitled to an entrapment instruction whenever "there exists evidence sufficient for a reasonable jury to find in his favor." *Mathews*, 485 U.S. at 61, 108 S.Ct. at 887; *United States v. Fusko*, 869 F.2d 1048, 1051–52 (7th Cir.1989); *United States v. Williams*, 877 F.2d 516 (7th Cir. 1989). The defendant's burden to warrant an entrapment instruction, therefore, is to produce evidence sufficient for a reasonable jury to find both a lack of predisposition and inducement by the government. Instructions on the entrapment defense are not required if the defendant has not met his threshold responsibility. *See United*

---

**1.** The trial judge rejected Russo's tendered instructions because she found that they were not supported by the evidence. She stated that "the defense wants the Court to engage in speculation, in innuendo, in connections that are third

and fourth hand removed to try to show that there was something that was said by the government or some action taken by the government, and the Court finds that there was none." Record at 3153–3155.

*States v. Hawkins,* 823 F.2d 1020 (7th Cir. 1987); *United States v. Buishas,* 791 F.2d 1310 (7th Cir.1986); *United States v. Manzella,* 791 F.2d 1263 (7th Cir.1986); *United States v. Rodgers,* 755 F.2d 533 (7th Cir. 1985); *United States v. Nicosia,* 638 F.2d 970 (7th Cir.1980). We must examine the record *de novo* to determine whether there was sufficient evidence for a reasonable jury to find a lack of predisposition and government inducement. *Hawkins,* 823 F.2d at 1025. We find that there was not.

■ Predisposition is defined as a defendant's state of mind and inclinations before his initial exposure to government agents. *United States v. Navarro,* 737 F.2d 625, 635 (7th Cir.1984); *United States v. Kaminiski,* 703 F.2d 1004, 1008 (7th Cir.1983). A predisposed defendant is "one who is ready and willing to commit an offense apart from government encouragement, and not an innocent person in whose mind the government implanted a disposition to commit an offense." *United States v. Gabriel,* 810 F.2d 627, 637 (7th Cir.1987) (citations omitted). The factors which we have held to be relevant in determining whether a defendant was predisposed to commit the crime include: (1) the character or reputation of the defendant; (2) whether the suggestion of criminal activity was originally made by the government; (3) whether the defendant was engaged in criminal activity for a profit; (4) whether the defendant evidenced a reluctance to commit the offense, overcome by government persuasion; and (5) the nature of the inducement or persuasion offered by the government. *Fusko,* 869 F.2d at 1052; *United States v. Perez–Leon,* 757 F.2d 866, 871 (7th Cir.), *cert. denied,* 474 U.S. 831, 106 S.Ct. 99, 88 L.Ed.2d 80 (1985); *Kaminiski,* 703 F.2d at 1008. The most important factor in determining a defendant's predisposition is whether the defendant evidenced a "reluctance to engage in the criminal activity that was overcome only by repeated government inducement." *Perez–Leon,* 757 F.2d at 871.

Applying these factors to the case at bar, we find that Russo has failed to meet his burden; there is insufficient evidence on the record for a reasonable jury to find that he was not predisposed to violate federal law. With regard to the first factor, Russo essentially admits that he ran a house of prostitution at Michael's Magic Touch continuously since the early 1970's and that he bribed state officials to allow the illicit enterprise to operate, thus establishing his criminal character. Examining the second factor, we find that there is no evidence on the record that the government initially suggested to Russo that he begin taking credit cards. To the contrary, it appears that the scheme was initially presented to Russo by Marren, his co-defendant, before the government entered the scene. As to the third factor, evidence was presented at trial that Russo made a small fortune off of the illicit activities at Michael's Magic Touch and that business boomed after the club began accepting credit cards. The fourth and fifth factors can be considered together. The fourth factor is, as we have already noted, the most important in determining a defendant's predisposition. *Perez–Leon,* 757 F.2d at 871. The record shows that when presented with the scheme at the initial meeting with Marren and Damron, Russo demonstrated no reluctance but instead asked questions that evidenced his awareness of the scheme and a predisposition to participate willingly. As Damron explained how the system worked, Russo exhibited none of the hesitations that customarily occur when parties to a new relationship first negotiate. Moreover, the meeting took place in the noncoercive atmosphere of Russo's own night club and only one government agent (along with Russo, his brothers, and Marren) was present. No money or equipment was presented or exchanged at the meeting and Russo was free to walk away from the scheme at any time. The record fails to show that he "ever expressed reluctance to commit the offense which was overcome only by repeated government inducement or persuasion." *Id.*

We also reject Russo's contention that taped conversations between Russo and Agent Damron after the government raid on the club demonstrate his lack of predis-

position. These conversations discuss problems with Russo's failure to report the credit card transaction income on his federal tax returns and not his willingness to participate in the credit card scheme. The taped comments can only be properly construed as expressions of concern that the evidence seized by federal agents would lead to the discovery of tax violations. Moreover, predisposition is defined as a defendant's state of mind and inclinations before his initial exposure to government agents. *United States v. Navarro*, 737 F.2d 625, 635 (7th Cir.1984); *United States v. Kaminiski*, 703 F.2d 1004, 1008 (7th Cir.1983). "[T]he principle focus ... of necessity must be on the first transaction." *Fusko*, 869 F.2d at 1052 (quoting *United States v. Gunter*, 741 F.2d 151, 154 (7th Cir.1984)). Evidence of comments made more than two years after the credit card activity began simply is too remote to have any reasonable bearing upon predisposition.

An analysis of these five factors demonstrates that there was insufficient evidence for a reasonable jury to believe that Russo was not predisposed to violate federal laws. Russo was not an "unwary innocent" but instead an "unwary criminal." *Sherman*, 356 U.S. at 372, 78 S.Ct. at 821. He was a comfortable veteran of the underworld who knowingly entered into a relationship to turn an illegal profit that, in the end, backfired.

Turning to the second element of the entrapment defense, government inducement, we find that the defendant similarly failed to meet his burden. To prove inducement the defendant must put forth evidence showing that he or she would not have committed the crime had the particular attraction or lure that the government held out not existed. *United States v.*

*Manzella*, 791 F.2d 1263, 1269 (7th Cir. 1986). We find that the record is devoid of any evidence of *government* inducement. In fact, what the record does show is that if Russo was induced into violating federal laws, he was induced by *Marren* and not by the government. Marren stated to Agent Damron that "I have really been trying to talk 'em (Michael's Magic Touch) into it you know," and later, "Yeah, I talked 'em into it last night." Moreover, it was Marren who was responsible for the initial meeting between Russo and the government agents. No claim of entrapment can be premised upon the instigations of a co-defendant who was not serving as an agent or informant for the government. *See United States v. Manzella*, 791 F.2d 1263, 1269–70 (7th Cir.1986). The record clearly fails to establish any credible basis for a belief that the government induced Russo into violating federal law.

■ In sum, we agree with the trial court that there is no evidence on the record upon which a jury could reasonably find a lack of predisposition and government inducement. Russo failed to meet his burden to warrant a jury instruction. Accordingly, we find that the trial court properly refused to instruct the jury on entrapment.[2]

### III. MARREN'S CLAIMS

Defendant Marren raises three claims on appeal. First, he contends that the government failed to prove beyond a reasonable doubt that he was a member of a conspiracy to violate RICO pursuant to 18 U.S.C. § 1962(d). Second, he similarly challenges the sufficiency of the evidence as to his conviction for conspiring to defraud the Internal Revenue Service of income taxes due to be paid by Michael's Magic Touch

**2.** The defendant also claims that there was sufficient evidence of "vicarious entrapment" by Victor Spilotro to support a jury instruction but cites no cases to support the existence of such a theory. A theory of vicarious entrapment is inconsistent with the premise that entrapment is a narrow defense, limited to inducements by the government upon persons to commit crimes that they were otherwise not predisposed to commit. *United States v. Rodgers*, 755 F.2d at

550. Moreover, as the government notes in its brief, we have previously asserted that the theory of vicarious entrapment "has no precedent in this circuit." *United States v. Buishas*, 791 F.2d 1310, 1314 (7th Cir.1986). The defendant has not provided us with any reasons, and we cannot find any on our own, why we should recognize such a defense. Accordingly, we find that the trial court properly refused to instruct the jury on this theory of defense.

**932**

pursuant to 18 U.S.C. § 371. Finally, he contends that his sentence for the RICO and tax fraud conspiracies was excessive, multiplicious and violative of the Double Jeopardy Clause of the fifth amendment.

## A. *The RICO Conspiracy*

■ Marren contends that the government failed to prove beyond a reasonable doubt that he was a member of the RICO conspiracy pursuant to § 1962(d). He insists that there was no connection between his "nebulous" activities as a doorman and the conduct of the enterprise, but instead, that the evidence showed only that he worked for himself as an entrepreneur, earning money by stealing from the enterprise. Relying on the government's failure to prove that he executed any of the credit card slips or any other incriminating documents, he maintains that he was "merely associated" with the conspiracy and did not embrace its objectives or participate in the racketeering activities.

Before we examine the record to determine whether the government met its burden at trial, it is important to note that Marren bears a heavy burden in trying to reverse his conviction for insufficient evidence. Our standard of review is well-established. If the reviewing court, considering all the evidence in the light most favorable to the prosecution, finds that *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt," it must affirm the conviction. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original); *United States v. Marrinson*, 832 F.2d 1465, 1469 (7th Cir.1987); *United States v. Conley*, 826 F.2d 551, 556 (7th Cir.1987). We can reverse Marren's conviction only if the record contains no evidence from which a rational jury could have found him guilty beyond a reasonable doubt. *United States v. Vega*, 860 F.2d 779, 792 (7th Cir.1988); *United States v. Gaddis*, 877 F.2d 605 (7th Cir.1989). We find that Marren has not met his burden in this case.

To prove a violation of § 1962(d), the government must show that a defendant (1) agreed to conduct or participate in the affairs of an enterprise and (2) agreed to the commission of two predicate acts. *United States v. Neapolitan*, 791 F.2d 489 (7th Cir.1986). In essence, Marren's assertion that he was merely associated with the conspiracy is a claim that he was not part of the agreement to participate in the activities of the conspiracy.

After a thorough examination of the record, we find that the government provided sufficient evidence that Marren was an active and knowing member of the conspiracy. In contrast to Marren's contention that he was merely associated with the criminal venture, the evidence adduced at trial showed that Marren was familiar with the NCS operation even before securing employment at Michael's Magic Touch. Once there, he helped convince the management to begin accepting credit cards as payment for prostitution. He arranged and attended the initial meeting between NCS and the Russos and he participated in discussions regarding the use of credit cards. Marren regularly collected the credit cards from the waitresses and brought them to the office where they were used to charge the fees for the prostitution activity, and he often made the calls to obtain authorization to accept the charge. Moreover, in his discussions with Agent Damron he repeatedly boasted about his prowess in convincing patrons to use their credit cards as payment for sexual services and at one point asked Damron to explain a money laundering scheme to the Russos.

We believe that Marren's contention of noninvolvement is simply unbelievable and finds no support in the record. The evidence adduced at trial was clearly sufficient for a reasonable jury to find that Marren was a knowledgeable and participating member of the RICO conspiracy. Accordingly, we affirm the conviction.

## B. *The Tax Fraud Conspiracy*

■ Marren challenges the sufficiency of the evidence for his conviction for conspiring to defraud the Internal Revenue Service of income taxes due to be paid by Michael's Magic Touch in violation of 18

U.S.C. § 371. Marren does not challenge the adequacy of the proof that a conspiracy existed or that at least one overt act was committed by a co-conspirator in furtherance of the conspiracy. Instead, his contention focuses on the adequacy of the proof of his knowledge of a tax-related conspiracy as he claims that the evidence failed to prove beyond a reasonable doubt that he knew that the goal of the RICO conspiracy was the avoidance of federal tax liability. Marren argues that the evidence established only that he was employed at a prostitution shop from which he stole credit card slips which he sold for cash to an undercover FBI agent and not that he was a knowing participant in the tax fraud scheme.

The crime of conspiring to defraud the United States is set out in § 371, which provides in pertinent part:

> If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

18 U.S.C. § 371.

In order to convict Marren of conspiracy under § 371, the government needed to prove at trial: (1) an agreement to accomplish an illegal objective against the United States; (2) one or more overt acts in furtherance of the illegal purpose; and (3) the intent to commit the substantive offense. *United States v. Hooks*, 848 F.2d 785 (7th Cir.1988); *United States v. Gaddis*, 877 F.2d 605 (7th Cir.1989). In *Ingram v. United States*, 360 U.S. 672, 678, 79 S.Ct. 1314, 1319, 3 L.Ed.2d 1503 (1959), the Supreme Court interpreted the third element of a § 371 offense. In evaluating a § 371 conspiracy to evade taxes, the Court found that the government need not prove "that the conspirators were aware of the criminality of their objectives" but it must show that they knew of the liability for federal taxes. "[C]onspiracy to commit a particular substantive offense cannot exist with-

out *at least* the degree of criminal intent necessary for the substantive offense itself." *Id.* (footnote omitted).

As we noted in *Hooks*, because a conspiracy is by its nature secret, its existence and common purpose must often be proved by circumstantial evidence. "The government need not establish that there existed a formal agreement to conspire; circumstantial evidence and reasonable inferences drawn therefrom concerning the relationship of the parties, their overt acts, and the totality of their conduct may serve as proof." *Hooks*, 848 F.2d at 792; *See also United States v. Redwine*, 715 F.2d 315, 320 (7th Cir.1983), *cert. denied*, 467 U.S. 1216, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). "Once the government proves the existence of the conspiracy, it need only offer 'slight evidence' to prove that an individual was a member of the conspiracy." *United States v. Whaley*, 830 F.2d 1469, 1473 (7th Cir. 1987) (quoting *United States v. Castillo*, 814 F.2d 351, 353 (7th Cir.1987)).

As discussed earlier, our standard of review for a claim of insufficiency of the evidence is well established. We must examine the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences, and can reverse only if we find that a reasonable fact-finder could not have found the essential elements of the offense beyond a reasonable doubt. *United States v. Colonia*, 870 F.2d 1319 (7th Cir.1989); *United States v. Rollins*, 862 F.2d 1282, 1287 (7th Cir. 1988). We can "reverse a jury's verdict of conviction only if the defendant can establish that 'the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.'" *Id.* (quoting *United States v. Goudy*, 792 F.2d 664, 674 (7th Cir.1986)).

Marren's contention that the government failed to establish at trial that he was a knowing participant in the tax fraud scheme finds no support in the evidence. The record is replete with evidence from which a reasonable jury could find his knowing involvement in the conspiracy. The government proved at trial that Mar-

ren instituted the process of accepting credit cards at Michael's Magic Touch and was present when the procedure was initially explained. Marren often accepted payments in cash or credit cards from the waitresses and doormen and then placed those payments in the club's office rather than in the cash register from which the income reflected in the daily reported receipts was derived. The government also provided evidence that he received a portion of the credit card income at the outset as he complained loudly and frequently to Agent Damron when his commissions came to an end. The fact that he at one time received a portion of the proceeds could lead the jury to reasonably infer that he had a stake in the successful outcome of the scheme. *See Hooks,* 848 F.2d at 793; *United States v. Collazo,* 815 F.2d 1138, 1143 (7th Cir.1987). Marren also knew that Damron was making weekly collections and that upon the week's take of credit card slips, Damron customarily gave one of the Russos a check made payable to cash. Finally, Marren asked Damron to explain to Russo a money laundering process which would aid in the evasion of taxes that Damron had evidently previously mentioned to Marren. We believe that the jury could reasonably infer from this evidence that Marren was knowingly involved in the tax conspiracy.

In sum, the government proved the existence of a conspiracy to defraud the federal government of tax revenues. Proof of Marren's knowledge of and participation in that conspiracy was certainly more than slight. Viewing the evidence in the light most favorable to the government, we find that a jury could reasonably find that Marren conspired to defraud the federal government of tax income.

## C. *Double Jeopardy*

Marren raises two challenges to his conviction and sentence under the Double Jeopardy Clause of the fifth amendment. First, he contends that the sentence he received on the RICO conviction violated the Double Jeopardy Clause because it was barred by a sentence previously imposed upon his prior conviction for counts that included a RICO conspiracy. Second, he asserts that the two conspiracy counts for which he was charged in this case were multiplicious and thus violated the Double Jeopardy Clause because they were part of a single overall conspiracy.

The Double Jeopardy Clause protects an individual from a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). Marren invokes the Double Jeopardy Clause to prevent being sentenced cumulatively to the sentence imposed in a previous conviction (No. 85 CR 555) because he believes that the RICO conspiracy alleged in the present indictment (No. 87 CR 501) and the RICO conspiracy to which he pled guilty in No. 85 CR 555 were portions of a single, overall RICO conspiracy. We disagree.

We begin by noting that Marren failed to raise his Double Jeopardy claim at the district court. As a result, the Record on Appeal is incomplete. It is Marren's responsibility, as the appellant, to ascertain that the Record on Appeal contains the materials necessary to resolve the issues that he desires this Court to review. Fed. R.App.Proc. 10, 11. To bolster the Record on Appeal, Marren appended to his brief the transcript of the sentencing proceedings in 85 CR 555 which forms the foundation for his double jeopardy challenge. To aid our review of his claim, we hereby take judicial notice of the transcript and the indictment in 85 CR 555 pursuant to Fed.R. Evid. 201(f) ("Judicial notice may be taken at any stage of the proceeding.").

To properly address Marren's claim that the previous RICO conspiracy and the present one were portions of an overall RICO conspiracy, we must examine the prior charge and conviction. From the limited record before us, it appears that in No. 85 CR 555 Marren and five police officers employed by the Office of the Sheriff of Cook County were charged with RICO conspiracy and a number of substantive of-

fenses, most of which alleged violations of the Hobbs Act, 18 U.S.C. § 1951. The indictment alleged that the RICO conspiracy was in operation as early as 1977. The pattern of racketeering involved 26 payoffs to the law enforcement officers to permit certain business establishments to operate as houses of prostitution and to allow certain bookmakers to operate. Paragraph 2 of the indictment stated that in July 1980, co-defendants Bruce Frasch (commander of the Vice Control Unit) and Robert Napora received a $10,000 bribe from Tom Gervais so that he could operate a house of prostitution known as "Delilah's Retreat." Paragraph 12 alleged that Frasch received $300 from Gervais to allow him to operate the Palatine Sporting Fans Club, an illegal off-track bookmaking business. Paragraph 13 alleged that on or about April 23, 1982, Marren received $1,000 from Frasch and James Keating (commander of the Intelligence Unit) for the purpose of influencing the disposition of criminal charges against one Sharon Raye in the local court and that the source of the money was undercover FBI Agent Larry Damron. Paragraphs 14–20 and 22 alleged that on various dates between May 4, 1982, and January 20, 1983, Keating, Frasch, and Marren received bribe money to allow Damron to operate the Palatine Sporting Fans Club apparently inherited from Gervais.

Marren pled guilty in 85 CR 555 to 12 counts, including RICO conspiracy, and he appeared before the trial judge for sentencing on July 18, 1986. At that time the prosecutor noted that in June 1982, Marren had entered a plea of guilty to forging government checks and transporting stolen securities, and that while presenting himself to the court in 1982 as contrite, he was engaged in the RICO and extortion crimes subsequently charged in No. 85 CR 555 as well as other offenses. The trial judge sentenced Marren to imprisonment for six years on the RICO conspiracy count and five years of probation on the remaining counts.

The Double Jeopardy Clause provides: "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const. amend. V. This Court has not yet addressed the issue of when separate indictments for RICO conspiracy violate the Double Jeopardy Clause, but four others have done so. The Eighth, Second, Eleventh and Third Circuits have adopted a five-factor test for determining whether separate RICO charges violate the Double Jeopardy Clause. The five factors are: (1) the time of the various activities charged as separate patterns of racketeering; (2) the identity of the persons involved in the activities under each charge; (3) the statutory offenses charged as racketeering activities in each charge; (4) the nature and scope of the activity the government seeks to punish under each charge; and (5) the places where the corrupt activity took place under each charge. *United States v. Dean,* 647 F.2d 779, 788 (8th Cir.1981), *modified en banc on other grounds,* 667 F.2d 729 (8th Cir.1981), *cert. denied,* 456 U.S. 1006, 102 S.Ct. 2296, 73 L.Ed.2d 1300 (1982); *United States v. Langella,* 804 F.2d 185, 189 (2d Cir.1986); *United States v. Ruggiero,* 754 F.2d 927, 932 (11th Cir. 1985) *cert. denied,* 471 U.S. 1127, 1137, 105 S.Ct. 2661, 2679, 86 L.Ed.2d 277, 697 (1985). *United States v. Ciancaglini,* 858 F.2d 923, 927–29 (3d Cir.1988) (adopting a "totality of the circumstances test" which focused on and applied the same five factors).

Applying the five-factor test, we believe that the two conspiracies involved in this appeal cannot be fairly regarded as part of one overall plan but instead are two separate conspiracies. The two conspiracies involved different criminal actors, with Marren being the sole common participant. The first RICO conspiracy began in 1977 and the second one not until 1981. There was no overlap between the patterns of racketeering activity alleged in the two indictments. The credit card scheme at Michael's Magic Touch of 1981 was wholly unrelated to the corrupt Cook County police officers and their extortion, payoff, and bribery activities of 1977. Marren's activities in 85 CR 555 included bribery, extortion, and influencing the disposition of criminal charges. These activities were separate and distinct from his involvement with the RICO conspiracy in the instant

case. Moreover, the overt acts differed completely. Finally, the two conspiracies the statutory offenses charged as racketeering in each charge were different.

Marren was charged with two RICO conspiracies because he was involved in two wholly distinct agreements to engage in patterns of racketeering. We believe that the different nature and delineated scope of each racketeering activity are dispositive on this issue and consequently the multiple punishments were permissible.

■ Marren next contends that the consecutive sentences imposed on him as a result of his conviction on the RICO conspiracy and the tax conspiracy counts violated the Double Jeopardy Clause which "protects against multiple punishments for the same offense." *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969). Marren argues that the two conspiracies arose out of the same set of facts and thus he has been unconstitutionally sentenced twice for the same acts.

■ In general, an agreement to commit several unlawful acts must be charged as a single conspiracy. *Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed. 23 (1942). An exception, however, exists where Congress has manifested an intent to authorize multiple punishments for conduct that violates two statutory provisions. *Albernaz v. United States,* 450 U.S. 333, 101 S.Ct. 1137, 67 L.Ed.2d 275 (1981); *American Tobacco Co. v. United States,* 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946). When such legislative intent is not readily discernible, courts use the test established by the Supreme Court in *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932), to determine whether Congress intended to authorize multiple punishments. *United States v. Jones,* 808 F.2d 561 (7th Cir.1986). Under *Blockburger,* two offenses are considered separately punishable if each statutory provision requires proof of a fact that

the other does not. *Blockburger,* 284 U.S. at 304, 52 S.Ct. at 182; *United States v. Patterson,* 782 F.2d 68, 72 (7th Cir.1986); *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989).

The only appellate court to have addressed whether a defendant can be charged under both § 1962(d) and § 371 is the Second Circuit. In *United States v. Barton,* 647 F.2d 224, 228 (2d Cir.1981), the Second Circuit examined the legislative intent behind RICO and § 371 and found that "[w]e are equally convinced that Congress intended that a court be able to impose cumulative sentences for violations of those sections." *Id.* The court noted that a ruling prohibiting joinder of a general conspiracy charge with RICO conspiracy would be inconsistent with the stated legislative purpose of RICO to expand criminal punishment. The court concluded that "[t]o hold that cumulative sentences could not be imposed ... in this case would plainly defeat Congress's intention to enhance the penalties imposed on those who conspire to engage in racketeering." *Id.* at 238. *See* P.L. 91-452, 84 Stat. 922 (Oct. 15, 1970); H.R.Rep. No. 91-1549, 91st Cong., 2d Sess. 57 (1970), *reprinted in* 1970 U.S. Code Cong. & Ad.News 4007, 4033. We agree. In the instant case, if Marren could only be charged under § 371 for a conspiracy to violate § 1962(d), the maximum sentence would be reduced from a $25,000 fine and imprisonment for twenty years, to a $10,000 fine and imprisonment for five years. And if a penalty could be imposed only under § 1962(d), the conspiracy to defraud the I.R.S. would not be punished at all. To so hold would be contrary to the legislature's stated intent in enacting the RICO statute.[3]

We believe that the reasoning of *Barton* is sound and should be followed here. It is evident that the legislature intended to allow multiple punishments under § 1962(d) and § 371. Accordingly, we hold that the government did not violate the Double

---

3. The court in *Barton* also applied the *Blockburger* test and found "certain obvious differences between the two statutes" including the fact that a conviction under § 371 required proof of a

fact not required under § 1962(d): "while the general conspiracy statute requires proof of an overt act, the RICO conspiracy section does not." *Id.* at 237 (citation omitted).

Jeopardy Clause by charging and sentencing the defendant under both § 371 and § 1962(d). *See United States v. Finley,* 705 F.Supp. 1272 (N.D.Ill.1988).

### D. *Sentencing*

Marren's final contention is that his sentence was excessive because it was more severe than the one imposed upon Thomas and Frank Russo despite the fact that the Russo brothers were convicted on more counts and shared in the profits of Michael's Magic Touch. Our standard of review for sentences within the maximum term provided by Congress is for a "manifest abuse of discretion." *United States v. Threw,* 861 F.2d 1046, 1049 (7th Cir.1988). A mere showing of disparity in sentences among codefendants does not, without more, demonstrate any abuse of discretion. *Id.; United States v. Neyens,* 831 F.2d 156, 159 (7th Cir.1987). In the instant case, the sentencing judge discussed the reasons for imposing different punishments. She expressed her disturbance with Marren's prior criminal record and the fact that he was on probation when he committed the offense charged in this indictment. She also took note of his crucial role in establishing the credit card operation and overseeing its smooth functioning at the outset. Therefore, it is apparent that the sentencing judge properly considered accurate information regarding Marren's role in the scheme and had a principled basis for sentencing Marren to a stiffer penalty. Accordingly, we affirm the sentence.

### IV.

For the foregoing reasons, the convictions and sentences are AFFIRMED.